The bill stated that the plaintiff's late father was seized in fee of a tract of land containing 50 acres, on which he resided, in Wake County, and was also the owner of four negroes and some other personal estate, such as furniture and stock; that he had never more than a very ordinary understanding, when his habits of life were regular and good, and that in the latter part of his life he became much addicted to drinking, and that about the period of the transactions complained of, his habits (242) of intemperance where confirmed and inveterate, and his health impaired from those causes and old age, he being then about the age of 70, and that he was thereby rendered utterly unable to manage his business with discretion, and but little if at all removed from strict legal incapacity of mind; that while in that state the defendant Hutchins and one Utley commenced suits, by way of warrants, against him for an alleged trading with slaves, and also preferred indictments therefor; that the other defendant, John Buffalow, was the relation of Steele Buffalow, and affected to be his friend; that he was a man of much acuteness and speculating turn, and succeeded by professions of regard and other artifices in insinuating himself into the good opinion and entire confidence of the other, as a friend and agent, capable of serving *Page 203 
and willing to serve him in the management of the said business, for which Steele had no skill himself; that John Buffalow, finding Settle greatly agitated and alarmed, represented that the prosecutions would be successfully carried on, and impressed upon his mind that they would result in his ruin and leave him without the means of support in his old age; that, availing himself of terrors thus produced by him, or perceived to exist, John offered as his friend and proffered to secure him against all the suits and to provide him a suitable maintenance for the residue of his life, if Steele would convey to him his land and slaves and other property; that Steele, with alarms thus excited by artful suggestions operating on his weak and decayed mind, embraced the insidious offer, and, on 7 October, 1831, conveyed his whole property to the defendant John Buffalow, who soon after took possession thereof and conveyed the land to the other defendant, Hutchins, between whom and John Buffalow the suits were in some way settled.
The bill then stated that in the belief of the plaintiff the warrants and prosecutions were instituted in consequence of some understanding between the two defendants to speculate upon the alarms of Steele Buffalow and divide the spoils; or, if mistaken therein, that the negotiation of John Buffalow was commenced and carried on in concert with the other defendant, upon an agreement, implied or expressed, that Hutchins should take the land as his share and the other (243) defendant keep the residue of the property.
The bill then charged that, at all events, and if the two defendants did not unite in the active perpetration of the fraud as alleged, yet from the relations between the parties as kinsmen and friends, and as principal and agent, professing to interpose from affectionate consideration of the other's afflictions, incapacities, and distresses, and from the surprise and undue advantage in procuring the conveyances from one in the condition of said Steele, they ought not to stand in this Court. The bill further charged that Hutchins did not pay any valuable consideration for the land, and also had notice of all the matters affecting the transaction between Steele and John Buffalow.
The bill further stated that Steele Buffalow died intestate, about six months after the deeds were procured from him, and left the plaintiff his only child and heir at law, to whom, also, letters of administration on the personal estate had been granted.
The answer of John Buffalow admitted the conveyances at the time charged in the bill, and that Steele Buffalow, who was his uncle, was then between 60 and 70 years of age; that he was not a man of any remarkable powers of mind or discretion, but was a man of ordinary capacity in his youth, and at times addicted to intemperance, but denied that he was legally incompetent to transact business. *Page 204 
The answer then stated that this defendant resided in Raleigh, and Steele Buffalow a few miles off; that on 6 October, 1831, the uncle came to the defendant's house and told him that judgment had been rendered against him for $100 as a penalty for trading with a negro. Immediately afterwards a constable came to the house and served two other warrants on him for like penalties, at the suit of one Utley, who was also the plaintiff in that which had just been tried; and "the said Steele invited this defendant to go with him before the magistrate, as he might require some surety to prevent him being put in jail; and the defendant went, and the magistrate continued the cases for the absence of (244) a witness." At that time, also, the defendant Hutchins, as prosecutor, preferred three bills of indictment for the same offenses in the Superior Court, which were found by the grand jury. The answer of Buffalow positively denied any agency, directly or indirectly, on his part in causing the warrants or indictments to be instituted. He stated that the first he (John) knew of them was from Steele himself, and "that on 7 October, 1831, of his own head, he proposed to this defendant that he would convey to him, as his absolute property, the land and four negroes if this defendant would bind himself to pay all the just debts of the said Steele and support him during his life. This defendant at first refused to do so; but, after being persuaded, he consented, and the deeds were drawn" — which were exhibited with the answer. One of them was a deed of bargain and sale for the land, expressed to be made in consideration of $100, and was drawn by a gentleman of the city, not a professional person. A second was a bill of sale for the four slaves, expressed to be in consideration "of an agreement this day sealed and delivered by John Buffalow, by which the said John hath agreed to support and maintain the said Steele during his natural life, and to pay all the debts justly owing by the said Steele; and in the further consideration of one dollar." A third was in these words:
"Know all men by these presents, that for and in consideration of the conveyance of four slaves to John Buffalow by Steele Buffalow, the said John, for himself and his heirs, doth covenant and agree with said Steele as follows: That the said John will pay off and discharge all debts now justly owing, or that may become due hereafter on contracts now existing, if such there be, so that the creditors of said Steele shall in no manner harass the said Steele — the said Steele, however, consenting that the said John may, at his own expense, resist all demands which he may consider unjust, and be allowed the benefit of all legal or equitable set-offs with any of the creditors of said Steele. Further, also, that he, the said John, will comfortably maintain and support the said Steele, as a boarder at the house of said John, during the life of said Steele, and decently clothe him, provide for him all necessary medical aid and *Page 205 
attendance during sickness; and if the said John die before the (245) said Steele, then he will provide for his maintenance, support, and comfort, as above stated, in the family of the said John Buffalow."
Which was signed and sealed by the defendant John. The three deeds were attested by the same witness, and the answer stated that the two latter were drawn by counsel, according to the proposition of said Steele, and that the covenant from John to Steele Buffalow was deposited with the gentleman who attested the instruments.
This answer further stated the value of the slaves to be about $800, and of the land to be about $100; that Steele was guilty of the offenses charged against him, as the prosecutors could have proved, and as he admitted to this defendant; that his other debts exceeded $200; that this defendant became immediately responsible for fees of attorneys to defend the said suits and indictments, and became liable to meet the judgments that might be rendered thereon.
This answer further stated that a day or two before 12 October, 1831, this defendant met with said Utley, and told him of the agreement, and asked him to compromise the warrants, and he agreed to do so if this defendant would give him the tract of land of 50 acres; and, thereupon, this defendant accepted the offer, and the warrants were compromised, the said Utley declaring that he would not do so, but for the sake of personally accommodating this defendant, and on 12 October, 1831, the said Utley stated to the defendant that he had sold the land to John Hutchins, and directed the defendant to convey to Hutchins, which was done. At Spring Term, 1832, of the Superior Court, Steele Buffalow was sick, and could not attend; but, in his absence, this defendant, on his behalf, pleaded guilty, upon the agreement of the prosecuting officer to claim only the costs, which the defendant paid.
The answer further stated that in November, 1831, at the proposal of the present plaintiff, the defendant agreed to board with the plaintiff, his father, said Steele, at $50 per annum, and the charges for medical attendance to be paid by the defendant; and said Steele was willing and desirous that the arrangement should be made. Steele Buffalow died on 27 April, 1832, at the plaintiff's.
The answer then admitted that in the event the bargain had (246) been a gainful one to the defendant, but insisted that he incurred the risk of its turning out a losing one, and that he ought to have the benefit of it in this Court. It denied "that this defendant made any particular or extravagant assurances of affection for his said uncle, to insinuate himself into his good graces, or that he used any art or persuasion to prevail on him to make the agreement; but said, on the contrary, that said Steele made the proposition, and pressed it on the *Page 206 
defendant. The defendant used no means to alarm or excite the fears of the said Steele about said suits or indictments, or told him that he would lose them, as he knew nothing more than what said Steele himself told him, namely, that he was guilty. This defendant positively denied that said Steele was intoxicated when he signed the deeds or when he made the agreement, or that the defendant furnished him with excessive quantities of ardent spirits afterwards. On the contrary, the contract was of the suggestion of said Steele himself, and was freely made by him, when perfectly sober and capable to transact business."
The answer of the other defendant, Hutchins, stated no material facts different from those set forth in the other answer, except that it alleged that this defendant, after he was informed by Utley of the compromise between him and John Buffalow, agreed to purchase the land from Utley, and paid in money and liabilities "assumed for said Utley to the value of the said land." It admitted that this defendant was prosecutor in the indictments, and that after they were preferred Utley told him that he intended to take out the warrants, in which the defendant encouraged him. But he averred that there was no concert in any of those transactions between John Buffalow and himself, or Utley, as far as he knew; and that he was induced to interfere or act as he did, not for the purpose of getting any of Steele Buffalow's property, but solely to prevent the ruin of his slaves by means of the trading which he believed Steele Buffalow carried on with them. (247) The deed to the defendant Hutchins was exhibited, and it was dated 10 October, 1831, and was attested by the same gentleman who witnessed the instruments between the two Buffalows.
The parties proceeded to take testimony, and among the depositions on file were those of the gentlemen who drew the papers and attested them. One of them stated that he had but little knowledge of Steele Buffalow; that he and John Buffalow came to him together, and jointly requested him to draw the instruments; that he drew the deed for the land, but advised the parties to get counsel to put the other papers into proper form; that John Buffalow did so, and brought them back, when they were all executed by the parties and witnessed by him; that only one other person was present; and that Steele Buffalow was not drunk at the execution of the deed, nor did he manifest symptoms of a disordered intellect.
The gentleman of the bar who drew these papers stated that Steele Buffalow was not before him, nor known to him; that John Buffalow stated the advice given them to have the paper drafted by counsel, and that he had accordingly applied to him; that he drew the instruments agreeably to the instructions of John Buffalow, who took them, when *Page 207 
prepared, and carried them to be executed where the other persons were waiting for him.
It was also sufficiently established by the proofs that Steele Buffalow was then 61 years old, of little mental capacity, and that little much impaired by habitual intemperance, to the extent of drunkenness, whenever an opportunity offered; that he had the rheumatism badly, and was very infirm for his age, and unable to labor. There was also testimony that Steele Buffalow afterwards expressed himself to be satisfied with the arrangement, and at other times to be much dissatisfied.
The evidence not being satisfactory on some other questions of fact, the court directed the master to make certain inquiries, and in the report it was stated that the negroes were worth $785 and the land $100; that the hire of the slaves, for seven years average, was worth $25 per annum and the annual rent of the land $25 more; that Steele Buffalow also made, at the same time, to John Buffalow another conveyance (not mentioned in the pleadings) for a mare, some hogs, corn and (248) fodder, and indifferent furniture, being all the property Steele Buffalow had — of which John left with the present plaintiff a part, and took the residue himself, to the value of about $60; that John Buffalow represented the debts of Steele, paid by him, to amount to $268.70, but had offered no proof thereof; and that the annual expense of maintaining Steele, in the manner stipulated in the contract, would be $145 or $150.
The master also reported, upon the evidence of the gentleman who witnessed the deeds, that from his appearance at that time, the probable duration of the life of Steele Buffalow might be from ten to fifteen years.
It was said by the counsel for the defendant that the argument against him rests upon the assumption that all such transactions are fraudulent, rather than upon proof of any fraud in this case. To the Court, however, it seems that both upon a general principle of presumption against such dealings and upon the particular circumstances of this case the plaintiff must be relieved.
There is very little doubt as to any material fact. It may, however, be remarked in the beginning that the master must be mistaken in reporting the value of the fee in the land at $100, for he himself makes the rent for only seven years $175. The ground also for deeming Steele Buffalow's life good for ten or fifteen years is unsatisfactory. Only one witness thinks so, and he had but little knowledge of him, and judges only from his appearance when the deeds were executed. Several others, *Page 208 
who knew him well, describe his age, habits, and state of health in such terms as establish a moral improbability that his life would endure beyond the period it had then attained, which was, indeed, the ordinary limit of human life. It is apparent that this man's was almost as poor a life as could have been selected.
(249) It is quite plain that this affair arose on the sudden, out of the legal proceedings instituted against the plaintiff's father, and that the contract was not deliberately considered by him or by any one of them, but that he was drawn into it, or suffered to run into it, without advice of counsel or consultation with friends, excepting only the very person to whom the conveyances were made, and who then had the entire confidence of the donor, and all the influence over him which such confidence in a friend, near relation, adviser and agent would produce in a weak and distressed man. The case, we think, is within the policy which corrects underhand agreements between attorney and client.
It is not pretended that such an arrangement had been thought of before 6 October, 1831. There was no dissatisfaction between the plaintiff and his father, and no previous purpose of the latter to advance the nephew in exclusion of the natural object of his affection. On the day mentioned the old man came to town on a visit to his nephew. As soon as he arrived, his difficulties commenced, and he naturally had recourse to his nephew for advice and assistance. While engaged in relating what had occurred, two other warrants are served on him, and he is informed of three indictments being found. Being instantly taken before the magistrate, and in dread of imprisonment, he requested, or, as the answer has it, "invited" his relation to attend and assist him. Can it be doubted that the uncle was deemed, or, at least, felt himself incapable of contending with his adversaries, and that John Buffalow went for the purpose of managing the cases before the magistrate, or settling them with the party? A single fact, if there was nothing else, suffices to bring us to that conclusion. It is the fact disclosed in the answer, that the accused confessed his guilt to his nephew. Why? Not by way of appeasing the opposite party or satisfying justice; for then it would have been disclosed to the magistrate. It was, then, to John Buffalow as a competent and confidential friend, that he might understand the whole case and be the better qualified to advise a defense or settlement. A confidence thus gained, and for such purposes, brings the case within the reason of the rule alluded to. It is true, these persons did not literally bear the names of attorney and client, but they did substantially. (250) The cases were triable before a justice of the peace out of court, before whom attorneys do not appear. But services to be rendered there similar to those of the professional man in court invest the person, from whom the services are to come, with the character of solicitor, for *Page 209 
the purposes of the rule. The man had influence to gain the secret of his uncle, and thus held him in subjugation; and the secret must have been imparted with a view to the more advantageous conducting of the business. There was, then, in fact a relation of employer and agent between these parties, under circumstances in which much confidence would probably be placed, and entire confidence was actually placed by the former in the latter. The rule on which the court interferes between attorney and client would be a lifeless skeleton unless animated by principle which will enable it to embrace all cases of the abuse of the like confidence. Had an attorney drawn a client to an agreement during the continuance of the relation between them, or as a condition of undertaking his case, there could be no hesitation to annual it. We think it would be equally mischievous to allow this defendant to retain the advantage he has attempted to gain. The court must be watchful against contracts inconsistent with the fidelity that ought to characterize all the intercourse between one who undertakes for another who is dependent on his skill and integrity. There are many circumstances in this case which show it to be a proper one for the application of the principle, for it seems to us that these conveyances were obtained upon an inadequate consideration, and by surprise, from a very weak man, who thought himself secure in the hands of a friend.
In the first place, it is a matter of some astonishment that we do not find any evidence of Steele Buffalow's guilt of the offenses imputed to him. It is true that there is a plea of guilty on the records of the indictments. But the answer admits that was not the plea of Steele Buffalow, but was pleaded by his nephew, for him, and while he was on his deathbed. We cannot assume his guilt without some evidence of it; and taking him to have been innocent, the defendant's case is, indeed, barefaced.
But, supposing him to be guilty, there would remain insuperable objections to the transaction. The defendant does not establish (251) any debts owing by the donor, or even if the answer be looked at, on this point, only to the amount of about $200. Then the consideration of the deed was, substantially, the maintenance of the uncle during the short remnant of his days. That was, in reality, almost nothing — he died in six months. For that the defendant took absolute conveyances of all his uncle's property, without leaving in him the right to anything, in any event; and the value of the effects thus conveyed must have been at least $1,000. It is an obvious remark that the maintenance of the old man actually cost the nephew only at the rate of $50 a year; and, therefore, would be satisfied by the annual profits of the property. But it is said that the maintenance, as stipulated for by the defendant, was worth $150, and that the change was at the request of the uncle, and, therefore, no violation of the agreement. If so, it is the stronger evidence of *Page 210 
incapacity and surprise. The defendant, in the very next month after the agreement, sent his father back to the plaintiff, to whom he was to pay $50; and with this the father and son are represented to be satisfied. It shows how easily they were persuaded to let the defendant pocket two-thirds of the sum at which, as a consideration for the agreement, he had estimated the board the previous month; or that the father and son, if left to themselves, each preferred living with the other, though in the more homely manner of the country. As the matter was actually managed, the transaction is one in which the consideration of the conveyances is the personal agreement of the donee to maintain the donor out of the annual profits of the property conveyed. An agreement of that sort, without any reference to the confidential relation between the parties or to any state of anxiety and alarm in which the donor was, is in itself an object of much animadversion. It is so easy to procure assignments from those who from decrepitude, mental weakness, and dotage must have some one to lean on, and are dependent for their comforts and opinions on those around them, as to render vigilance an indispensable duty of the court against imposition in cases of (252) this kind, and to call for evidence that the agreement was reasonable and prudent; that it had been duly weighed by the party subject to imposition, and had been approved of, or at least known to the nearest members of his family. At the first blush such a transaction, without explanation, imports undue advantage; for, in effect, one party gets the estate for managing it during the life of the older.
In the case before us there is not a single circumstance in favor of the defendant's conduct. There was no deliberation nor opportunity for it, on the part of the donor, nor of consultation with his son and heir apparent. He left home one day, without a thought of any such arrangement, and on that day and the next the business was begun and brought to a close, upon terms which left him no home and reduced him to being a pensioner, dependent on his nephew. The answer says it was a proposal of the uncle, of his own head, and that the defendant at first refused, and at last reluctantly consented, after being repeatedly pressed; and therefore it insists that it was a voluntary act of the uncle, and while he was sober. We have no thought, after reading the evidence, that Steele Buffalow was actually intoxicated when he executed the instruments before the gentleman who attested them; nor is it doubted that he was willing, at the moment, to sign them. But it cannot be believed that the act was voluntary in the sense in which a court of conscience uses that term, namely, that it was an unbiased act, deliberately assented to after being fully understood. There is no evidence to those points, and we can hardly imagine any sufficient to establish them. Not a witness saw these two men together, heard a word between them, *Page 211 
until the defendant took his uncle to a gentleman to ask his assistance in drawing the deeds. Then, no doubt, he was willing to sign them. But our inquiry is, How was he rendered thus willing? Did he become so from the action of a competent, collected judgment of his own, or from the prudent counsels of friends disposed to consult his interests? The evidence clearly proves that Steele Buffalow, though not non compos, was always of weak mind, and that it was much impaired. In the hurried state of his feelings at that time, he could not judge for himself. He was entitled to the aid of his friends, and the defendant (253) ought not to have dealt with him until he had such aid. There was no person to propose terms on the part of the donor, and his interest was wholly neglected.
There is in this case every circumstance on which the case of Clarkson v. Hanway, 2 Pr. Wms., 203, was decided, and many others. When John Buffalow went to counsel to get the deeds drawn, he does not even request the other party to accompany him. He simply gave directions for the preservation of his own interests. If the other had also gone and placed himself in the hands of the counsel, such papers as these could never have been drawn. The donor is, by them, simply to have life sustained. There is no selection of the place of residence reserved to the donor; no fixed sum allowed, but it is left vaguely open to evasion and litigation, when the donor will have no funds to go to law upon; and the support thus provided is secured only by the personal covenant of the nephew. We would by no means say that the validity of an agreement is thought by the Court to depend on each or either party having an attorney, or that the intervention of any third party is ordinarily requisite. In this State most persons bargain for themselves, and put their agreements into writings themselves. But this man must be acknowledged to have been incompetent for that. When an attorney, as the common one of both parties, was engaged to draw the instruments, there ought to have been an opportunity afforded the counsel to see the weak man, receive his directions, or, at least, understand his situation and views, and provide properly against advantage being taken of him, and for the permanent security of his rights under the agreement. When this was not done, and the party's son was also kept in the dark until the property had been irrevocably conveyed, and it is found that the agreement as procured was unequal and unreasonable, and that the interest of the vendor under it is vague and uncertain, and even that insufficiently secured, there is no rational conclusion left for our adoption, but that the weak and distressed man has been drawn into such an agreement by fraud and surprise; and that, on those grounds, he must be relieved by holding the conveyances to be only a security for what has been done under them. *Page 212 
(254) The defendant Hutchins must abide by the fate of his codefendant, through whom he derives his title. There is no proof that he paid the purchase money he says he agreed to give Utley. That person did not pay anything either. He says the land was to be conveyed by way of compromising the warrants. But they were not evidences of debts against Steele Buffalow; for only one had been tried, and the judgment on that was annulled by appeal. It is remarkable, too, that this is another feature of imposition on the gentleman of the bar who drew the other instruments, for they do not speak of the land or other property conveyed, except the negroes; and no doubt he was told that the slaves formed the entire consideration for the stipulations on the part of John Buffalow, or was not told that there was any other.
Upon the whole, therefore, the plaintiff is entitled to an account of the sums paid for his father, and of the value and profits of the slaves and their increase, and of the land and other property; and, upon payment of the balance, to have a reconveyance.
PER CURIAM. Decree accordingly.
Cited: S. c., 37 N.C. 113; Deaton v. Munroe, 57 N.C. 41; Mullins v. McCandless, ibid, 429; Futrell v. Futrell, 58 N.C. 65; Bean v. R. R., 107 N.C. 747; Helms v. Helms, 135 N.C. 172; Balthrop v. Todd, 145 N.C. 114; West v. R. R., 151 N.C. 234; Bellamy v. Andrews, ibid., 258; Pritchard v. Smith, 160 N.C. 84; Dixon v. Green, 178 N.C. 210.